

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **I N D I C T M E N T** |
| Plaintiff, | ) ) ) | |
| v. | ) ) | CASE NO. 4:18 CR 628 |
| BRIAN K. CARDER, PAUL LOVE, | ) ) ) ) | Title 18, Sections 1001, 1505, 1512(c)(2), 1512(k), and 2 United States Code |
| Defendants. | ) ) ) ) ) | JUDGE OLIVER |

## GENERAL ALLEGATIONS

At all times material to this Indictment:

1. Defendant BRIAN K. CARDER (hereinafter, "CARDER") was a United States citizen, and a resident of the State of Ohio, within the Northern District of Ohio, Eastern Division.

2. Defendant PAUL LOVE (hereinafter, "LOVE") was a United States citizen, and a resident of the State of Ohio, within the Northern District of Ohio, Eastern Division.

3. Extrudex Aluminum, Inc. (hereinafter, "Extrudex") was an aluminum extrusion manufacturing company with a facility in North Jackson, Ohio, within the Northern District of Ohio, Eastern Division.

4. CARDER was the General Manager of Extrudex.

5. LOVE was the safety coordinator and human resources director of Extrudex.

6. P.S. was a general foreman and supervisor at Extrudex.

7. T.L. was a shipping supervisor at Extrudex.

8. J.T. was an employee of Extrudex. On or about October 30, 2012, J.T. was fatally injured, while working at Extrudex.

9. D.B. was an employee of Extrudex. On or about October 30, 2012, D.B. was seriously injured, while working at Extrudex.

10. M.O. was a maintenance manager at Extrudex.

11. D.H. was a plant manager at Extrudex.

12. S.C. was an extrusion manager at Extrudex.

13. R.M., T.P. and L.C. were Extrudex employees.

14. The Occupational Safety and Health Administration ("OSHA"), was a part of the United States Department of Labor and was an executive branch agency of the Government of the United States of America. OSHA was created to assure safe and healthful working conditions for workers by setting and enforcing standards, and was responsible for investigating violations of those standards.

15. The United States Department of Labor, Office of Inspector General, was an executive branch agency of the Government of the United States of America.

## FACTUAL ALLEGATIONS

16. The Extrudex facility located in North Jackson, Ohio, processed aluminum specializing in larger shapes. A part of this process included the conveyance of extruded aluminum pieces through a long, walk-in, tunnel style oven, known as an "age oven." This age oven was located at the North Jackson, Ohio, Extrudex facility.

17. As a normal part of their job duties, Extrudex employees routinely loaded and unloaded the oven manually by pushing the racks of aluminum into and out of the oven on a roller conveyor system that is bolted onto the floor (the "racks and rollers").

18. On or about December 3, 2009, CARDER sent an email to R.M. and copied T.P., S.C. and LOVE, regarding maintenance and safety issues with the racks and rollers conveyor system in the age ovens. Among other things, CARDER stated that the racks and rollers system was "in need of dire attention" and that issues with the system "must be a priority or someone is going to get seriously hurt."

19. On or about November 30, 2011, LOVE sent an email to employees of Extrudex and copied CARDER, regarding age oven racks falling off the rollers.

20. On or about June 12, 2012, CARDER sent an email to L.C., M.O., S.C. and LOVE, regarding safety issues with the racks and rollers conveyor system. CARDER stated that he witnessed racks fall off the rollers and that maintenance was needed. CARDER additionally explained the imperative need to continue to monitor and conduct regular maintenance on the system, and stated that "[w]e are going to wait until someone gets seriously injured or possibly killed when a rack falls on them."

21. On that same date, LOVE forwarded the aforementioned email from CARDER to M.O. and copied CARDER stating that routine inspection of the racks and rollers "must be a top priority issue."

22. On that same date, M.O. replied to LOVE explaining the issues with the racks and rollers system and the reasons racks fall off the rollers. Additionally, M.O. notified LOVE that "[m]aintenance will do their part inspecting during the week but that is no guarantee this will not happen."

23. On that same date, LOVE forwarded the aforementioned email from M.O. to CARDER.

24. On or about June 26, 2012, T.L. sent an email to LOVE, stating that a rack fell off the rollers and that racks were frequently "freezing up" inside the oven requiring multiple people to get them to roll. Additionally, T.L. stated that "I'm afraid someone is going to get hurt if we can't think of a better system to get these racks out of the oven safely."

25. On that same date, LOVE forwarded T.L.'s aforementioned email to M.O. and copied CARDER.

26. On or about October 26, 2012, T.L. sent another email to M.O., maintenance manager at Extrudex and D.H., plant manager at Extrudex, stating that the oven racks fell off the rollers twice that night and that "[s]omeone is going to [get] hurt if nothing is done about it[.]"

27. On or about that same date, P.S. sent a separate email to M.O., D.H., and S.C., extrusion manager at Extrudex, also stating that the oven racks fell off the rollers twice that night and "someone is seriously going to get hurt or even killed because of this." P.S. further stated that the racks falling off the rollers was an ongoing problem that needed to be resolved as soon as possible.

4

28. On or about October 30, 2012, at Extrudex, two metal racks stacked on top of each other with hot aluminum product weighing an estimated 4,000 to 5,000 pounds tipped over onto two employees who were pushing the racks on the roller conveyor system through age oven #1. Both employees were pinned under the hot racks and hot aluminum product. One employee, D.B., was rescued by other workers and was hospitalized for severe burn injuries. The second employee, J.T., was pronounced dead at the scene.

29. On or about October 31, 2012, OSHA initiated an investigation into the fatality and injury at Extrudex.

30. Violations of OSHA rules and regulations could result in either civil or criminal sanctions and included monetary penalties. Violations could also lead to an employer being placed into the OSHA Severe Violator Enforcement Program ("SVEP"). The SVEP was intended to focus enforcement efforts on recalcitrant employers who demonstrated indifference to the health and safety of their employees through willful, repeated, or failure-to-abate violations relating to significant hazards. Employers in the program were placed on a public list identifying them as a severe violator. The SVEP had a number of methods by which to encourage severe violators to comply and abate hazards. Such methods included follow-up and related inspections, notifying company headquarters, and the inclusion of enhanced provisions within settlement agreements.

31. On or about October 31, 2012, an OSHA compliance officer interviewed T.L. and learned of emails that T.L. and P.S. sent to Extrudex management, referenced in paragraphs 24 through 26 of this Indictment, stating that there were safety issues with the racks and rollers.

32. After learning about the emails that T.L. and P.S. had sent to Extrudex management, OHSA requested that Extrudex, CARDER and LOVE produce all emails from T.L. and P.S. to management regarding racks and rollers. Extrudex, CARDER and LOVE then

produced the two above-mentioned October 26, 2012 emails from T.L. and P.S. However, Extrudex, CARDER and LOVE did not produce T.L.'s above-mentioned June 26, 2012 email.

## THE STATUTORY OFFENSES

### COUNT 1
(Conspiracy to Obstruct Justice, 18 U.S.C. § 1512(k))

The Grand Jury charges:

33. The factual allegations contained in paragraphs 1 through 32, are re-alleged and incorporated by reference as if fully set forth herein.

34. From on or about October 30, 2012, and continuing to on or about December 31, 2013, in the Northern District of Ohio, Eastern Division, Defendants BRIAN K. CARDER and PAUL LOVE (and others known and unknown to the grand jury) agreed, combined, and conspired to corruptly obstruct, influence and impede, an official proceeding, namely a United States Department of Labor Occupational Safety and Health Administration investigation of Extrudex, and did corruptly attempt to do so, in violation of Title 18, United States Code, Section 1512(c)(2).

### The Objects of the Conspiracy

35. The objects of the conspiracy were to: (a) cause Extrudex to be charged with a lesser type of OHSA violation; (b) cause Extrudex to be assessed a lesser penalty for its OSHA violations; and (c) to prevent Extrudex from being placed in the OSHA Severe Violator Enforcement Program.

### The Manner and Means of the Conspiracy

36. It was part of the conspiracy that:

    a. CARDER and LOVE, devised a plan to provide false statements to the OSHA investigator.

b. CARDER and LOVE persuaded T.L and P.S. to draft statements recanting their previous emails regarding the safety issues with the racks and rollers.

c. CARDER and LOVE caused T.L. and P.S.'s recanted statements to be produced to the OSHA compliance officer in the course of the OSHA investigation.

d. In an interview with the OSHA investigator, LOVE provided materially false statements regarding, among other things, the safety issues with the racks and rollers.

e. In Extrudex's response to the OSHA Citation and Notification of Penalty, CARDER provided materially false statements regarding, among other things, the safety issues with the racks and rollers.

### Acts in Furtherance of the Conspiracy

37. In furtherance of the conspiracy, and to effect the objects and conceal the existence thereof, Defendants and others preformed acts in the Northern District of Ohio, and elsewhere, including, but not limited to, the following:

#### Obstruction Related to T.L.

a. After the OSHA investigation began, and after OSHA requested emails from T.L. concerning the racks and rollers, CARDER called T.L. into his office to discuss his October 26, 2012 email. LOVE was also present at this meeting. At the meeting, CARDER and LOVE questioned T.L. about his email and suggested that his job might be in jeopardy due to the email.

b. Additionally, CARDER and LOVE asked T.L to write a statement falsely recanting his October 26, 2012, email and adding mitigating language at their behest.

c. T.L. complied and wrote the new statement because he feared losing his job.

    d.    On or about the day following the meeting with CARDER and LOVE, T.L. provided the requested statement to LOVE.

    e.    LOVE reviewed T.L.'s statement and told him it should be shorter.

    f.    LOVE revised T.L.'s statement. The LOVE-revised statement recanted T.L.'s October 26, 2012 email. In the LOVE-revised statement, T.L. explained that he sent the email "mostly out of frustration because of having to get them back onto the rollers and continuing to get the metal out of the ovens. When there is a problem like this here Extrudex is very good about getting the problem fixed. What happened on October 30, 2012, was an accident there was nothing no one or Extrudex could have done to prevent this anymore than what we did."

    g.    After revising the statement, LOVE provided the statement to T.L. for his signature.

    h.    T.L. signed the revised statement on or about November 5, 2012.

<u>Obstruction Related to P.S.</u>

    i.    After the OSHA investigation began, and after OSHA requested emails from P.S. concerning the racks and rollers, P.S. met with CARDER and LOVE in CARDER's office to discuss his October 26, 2012 email. At the meeting, CARDER told P.S. to retract his statements in his email and suggested that his job would be in jeopardy if he did not recant his earlier email.

    j.    LOVE told P.S. what to write in his statement.

    k.    CARDER and LOVE caused P.S. to draft a statement (falsely) qualifying his October 26, 2012 email. In the statement, P.S. claimed, "[a]t the time of the email I was frustrated and upset due to a rough night at work. And when we pushed the oven in and a rack

started to come off the rollers that just made me more upset. Now I never me[a]nt [sic] for my words in that email to be taken liter[al]ly [sic]. All I was attempting to do is grab the attention of Mainten[an]ce [sic] so they would look at the rollers as soon as possible. Now with that being said we have had different issues with the rollers over the past few years and Mainten[an]ce [sic] was always on top of the situation."

        l.        CARDER and LOVE produced and caused to be produced the revised P.S. and T.L. statements to OSHA during the course of the OSHA investigation.

        m.        After P.S.'s before-mentioned meeting with CARDER and LOVE, an OSHA compliance officer interviewed him. During that interview, at the instruction of CARDER and LOVE, P.S. told the OSHA compliance officer that he had written his October 26, 2012 email because he was having a bad day.

        n.        After the OSHA investigation began and after the OSHA request for specific emails, LOVE told the OSHA compliance officer that he was unaware of any reports regarding the racks coming off the rollers.

        o.        Additionally, LOVE told the OSHA compliance officer that he could not recall the issue of racks coming off the rollers coming up in any past plant meetings or safety meetings.

        p.        After OSHA provided Extrudex with its initial Citation and Notification of Penalty detailing OSHA's proposed citations and penalties, CARDER submitted a response to OSHA proposing a lesser type of violation and a lesser penalty. In the response, CARDER stated that the issue of the racks riding up the rollers is "extremely rare."

        q.        Additionally, CARDER stated that "[t]he accident could not have been prevented because there were no problems with the rollers and racks."

r.   On November 1, 2012, P.S. sent an email to LOVE and copied S.C. and D.H. proposing an idea to make the ovens safer.

s.   On November 2, 2012, D.H. forwarded the email to CARDER stating "[t]hink [P.S.] will be a problem."

t.   On that same date, CARDER responded to D.H. stating, "[t]ell [S.C] he needs to put [P.S.] in his place."

Effect of Conspiracy to Obstruct

38.   OSHA made fine determinations based on the seriousness and gravity of the offense. Offenses were rated based on severity.

39.   OSHA initially cited Extrudex with three willful violations. T.L. and P.S.'s October 26, 2012, emails contributed to the citations for willful violations.

40.   After CARDER, LOVE and Extrudex submitted their responses to OSHA, and caused T.L.'s and P.S.'s later statements falsely recanting their initial emails, OSHA changed its assessment, resulting in Extrudex being cited for only one willful violation. OSHA also reduced Extrudex's fine from $175,000 to $112,000.

All in violation of Title 18, United States Code, Section 1512(k).

**COUNT 2**
(Obstruction of Justice 18 U.S.C. § 1512(c)(2))

The Grand Jury further charges:

41.   The factual allegations contained in paragraphs 1 through 32, and 37 through 40, are re-alleged and incorporated by reference as if fully set forth herein.

42.   From on or about October 26, 2012, and continuing to on or about December 31, 2013, in the Northern District of Ohio, Eastern Division, Defendants BRIAN K. CARDER and PAUL LOVE did corruptly obstruct, influence and impede, an official proceeding, namely a

United States Department of Labor, Occupational Safety and Health Administration, investigation of Extrudex, and did corruptly attempt to do so.

All in violation of Title 18, United States Code, Sections 1512(c)(2) and 2.

## COUNT 3
(Obstruction of Proceedings 18 U.S.C. § 1505)

The Grand Jury further charges:

43. The factual allegations contained in paragraphs 1 through 32, and 37 through 40 are re-alleged and incorporated by reference as if fully set forth herein.

44. From on or about October 26, 2012, and continuing to on or about December 31, 2013, in the Northern District of Ohio, Eastern Division, Defendants BRIAN K. CARDER and PAUL LOVE did corruptly influence, obstruct and impede, and endeavored to influence, obstruct and impede, the due and proper administration of the law under which a pending proceeding, namely a United States Department of Labor, Occupational Safety and Health Administration, fatality investigation of Extrudex, was being had before the United States Department of Labor.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT 4
(False Statements to Law Enforcement 18 U.S.C. § 1001)

The Grand Jury further charges:

45. The factual allegations contained in paragraphs 1 through 32, are re-alleged and incorporated by reference as if fully set forth herein.

46. On or about March 31, 2016, in the Northern District of Ohio, Eastern Division, Defendant PAUL LOVE knowingly and willfully made material false statements to a Special

Agent and Investigator of the Department of Labor (hereinafter, the "DOL agents") in a matter within the jurisdiction of the executive branch of the Government of the United States, that is:

    a.    When asked about racks falling off the rollers in the past, LOVE replied that he had never seen or heard of a rack fall inside the oven.

    b.    When asked about P.S. and T.L. drafting statements recanting their initial emails, LOVE replied that he did not recall asking P.S. or T.L. to write a statement and did not know they did write a statement.

All in violation of Title 18, United States Code, Section 1001.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.